J-A08025-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| KAREN N. BAUST | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOHN T. BAUST | |
| Appellant | No. 1324 MDA 2014 |

Appeal from the Order Entered on July 7, 2014
In the Court of Common Pleas of Adams County
Civil Division at No.: 2008-S-505

BEFORE:  SHOGAN, J., WECHT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY WECHT, J.:                    **FILED MAY 18, 2015**

John T. Baust ("Husband") appeals the July 7, 2014 order that granted in part and denied in part Karen N. Baust's ("Wife") Petition for Special Relief and Civil Contempt.  We affirm.

The parties married on August 25, 1984 and divorced on October 2, 2009.  Before entry of the divorce decree, the parties entered into an agreement that resolved all economic issues.  Among other things, Husband agreed to pay Wife alimony for five years; Husband and Wife agreed to pay half of some of their adult child's post-secondary education expenses for up to four years;[1] Husband agreed to transfer a health savings account to Wife

_____

[*]    Retired Senior Judge assigned to the Superior Court.

[1]    Per the agreement, post-secondary education expenses included tuition and room and board.  The child was to pay fifty percent of his
*(Footnote Continued Next Page)*

to be used for Wife's benefit; and Husband agreed to pay seventy percent of their child's car insurance.[2] The agreement was entered in open court, following which a transcript of the proceeding was filed with the court.

On February 24, 2014, Wife filed a Petition for Special Relief and Civil Contempt. In her petition, Wife alleged that Husband had not paid alimony as was required by the agreement and that Husband had not transferred the health savings account to Wife.

On May 20, 2014, the learned trial court held a hearing on Wife's petition. The court heard testimony from Husband and Wife. Wife argued the two issues listed above. Wife believed that she was owed approximately $16,500 from Husband. In response, Husband contended that he had paid more than his share of their child's post-secondary education expenses and car insurance. Husband claimed that these overpayments offset any obligations he had to Wife.

On July 7, 2014, the trial court issued its order. The court did not find Husband to be in contempt. The trial court found that Husband had overpaid for the child's college tuition, and that Husband would receive credit for some of the overpayment, but that Husband agreed to pay more

(Footnote Continued) ⎯⎯⎯⎯⎯⎯

expenses, Husband was to pay seventy percent of the remaining half, and Wife was to pay thirty percent of the remaining half. Wife alone was responsible for paying for the child's books.

[2] The agreement was silent as to who was responsible for the remaining thirty percent.

than his share for some of the overpayment. The trial court also found that Husband overpaid his share of the child's car insurance. The trial court calculated what Husband owed to Wife by adding the stipulated unpaid alimony plus the health savings account and giving Husband credit for the two items for which he overpaid. The trial court ordered Husband to pay $13,589.01 to Wife.

On August 5, 2014, Husband filed a notice of appeal. The trial court ordered, and Husband timely filed, a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On October 1, 2014, the trial court filed its opinion pursuant to Pa.R.A.P. 1925(a).

Husband raises three issues for our review:

1. Whether the trial court abused its discretion and/or made an error of law when it concluded, against the weight of the evidence, that [Wife] is not obligated to reimburse [Husband] for his $5,804.25 overpayment for the parties' son's tuition at Sheffield Institute when [Wife] failed to advise [Husband] of the grant that [Wife] obtained to lower the total school expenses and presented to [Husband] with an urgent need for money. [Husband] did not agree to pay more than his obligation.

2. Whether the trial court abused its discretion and/or made an error of law when it concluded, against the weight of the evidence, that [Husband] owes [Wife] the amount of $4,500.00 for the withdrawal of said funds from the health savings account when [Wife] knew that [Husband] used the funds for the parties' son's medical expenses, which was one of the purposes and intent of the account, especially when [Wife] never objected to the expenditures for several years.

3. Whether the trial court abused its discretion and or made an error of law when it concluded, against the weight of the evidence, that [Husband's] obligation to [Wife] is $13,589.01 as [Husband's] obligation should be $3,284.76.

Husband's Brief at 10.

> Our standard of review is well-settled:
>
> Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation. Our standard of review over questions of law is *de novo* and to the extent necessary, the scope of our review is plenary as the appellate court may review the entire record in making its decision. However, we are bound by the trial court's credibility determinations.
>
> When interpreting a marital settlement agreement, the trial court is the sole determiner of facts and absent an abuse of discretion, we will not usurp the trial court's fact-finding function. On appeal from an order interpreting a marital settlement agreement, we must decide whether the trial court committed an error of law or abused its discretion.

*Kraisinger v. Kraisinger*, 928 A.2d 333, 339 (Pa. Super. 2007) (citations omitted). Further,

> this Court[] must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial judge who presided over the proceedings and thus viewed the witnesses first hand.

*Mackay v. Mackay*, 984 A.2d 529, 533 (Pa. Super. 2009) (citation omitted).

Instantly, all three issues raised by Husband involve allegations that the trial court reached its conclusions against the weight of the evidence. We must defer to the trial court on the weight that the trial court assigned to the evidence presented. The trial court provided an accurate and thorough description of the testimony adduced at the hearing. Trial Court Opinion

("T.C.O."), 10/1/2014, at 4-19. The trial court also provided a detailed account of its consideration of the testimony and its conclusions based upon that evidence. *Id.* at 25-31. For each of the issues Husband appeals, each party provided testimony supporting his or her position. The trial court found Wife's testimony to be more credible, and issued its order accordingly. The trial court had the opportunity to observe both witnesses. We have reviewed the certified record. We conclude that the trial court's credibility and weight determinations are well-supported. We will not disturb those conclusions, and we find no abuse of discretion. Therefore, upon the basis of the trial court's well-reasoned opinion, we affirm the July 7, 2014 order. A copy of the trial court opinion is attached hereto for reference.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/18/2015

- 5 -

IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY,
PENNSYLVANIA
CIVIL

| | | |
|---|---|---|
| Karen N. Baust,<br>Plaintiff, | : | No. 08-S-505 |
| v. | : | |
| John T. Baust,<br>Defendant | : | ACTION IN DIVORCE |

## OPINION PURSUANT TO Pa.R.A.P. 1925(a)

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

Plaintiff-Appellee Karen N. Baust (hereinafter "Wife") is currently represented by

Heather E. Roberts, Esquire, and was previously represented by Muriel Anne Crabbs, Esquire,

and Defendant-Appellant John T. Baust (hereinafter "Husband") is represented by John James

Mooney, III, Esquire. The parties were married on August 25, 1984. Wife filed a Divorce

Complaint on April 8, 2008, which was served on Husband's attorney by Acceptance of Service

on April 10, 2008.

On January 14, 2009, Husband filed a Motion to Appoint Divorce Master. By Order of

Court dated January 22, 2009, John A. Wolfe, Esquire, was appointed Master with respect to the

claims of Alimony, Distribution of Property, Counsel Fees, and Costs and Expenses.

A Master's Hearing was held on September 3, 2009, during which the parties put an

agreement resolving all economic issues on the record. This agreement was transcribed, and filed

on September 15, 2009 as the "Master's Hearing Agreement – Transcript of Proceedings"

(hereinafter "the Agreement.")

The Agreement contained several pertinent provisions as related to this Court's Order of Court dated July 7, 2014 and the instant appeal of that order. Regarding educational costs:

> The Parties have also reached an agreement with respect to the college expenditures of their son TJ Baust who is a freshman at Shippensburg University.
>
> The parents are going to be responsible for 50 percent of their child's tuition and room and board. And of that 50 percent, Husband agrees that he will pay 70 percent of that tuition and room and board and Wife would be responsible for the other 30 percent. Wife also agrees to be responsible for the book costs.

Agreement at 5.

> Furthermore, the college tuition for the son TJ will be limited to four years of college.

Agreement at 7.

Regarding alimony:

> And 30 days after the settlement on that property, but not sooner than the first day of the following month, [Husband] will begin to pay Wife alimony in the amount of $500 per month for a period of five years which will be due on the first day of each month thereafter.

Agreement at 3.

> And finally with respect to the alimony due to Wife, that amount would be non modifiable and would not terminate or modify upon any conditions except that it would terminate upon death [of either party].

Agreement at 7.

Regarding a health savings account:

> Husband will also take all efforts necessary to transfer and cooperate in making the health savings account that he currently owns available to Wife for her use. That could either be by transferring to her name or by making it possible for her health insurance premiums to be paid by that account.
>
> The account has an approximate balance of $4,500 and all those funds will be for Wife's benefit. In the event that Wife elects to cash in that account, there will be tax consequences to Husband. Wife agrees to reimburse Husband for any actual tax consequences that occur[] as a result of the cashing in of the health savings account.

2

Agreement at 4.

On October 2, 2009, this Court entered the Decree of Divorce, divorcing the parties from the bonds of matrimony. The Decree of Divorce incorporated but did not merge the parties' Agreement into the Decree.

On February 24, 2014, Wife filed a Petition for Special Relief and Civil Contempt for Disobedience of an Order, alleging, among other things, that Husband willfully failed to make timely alimony payments to Wife and owed Wife approximately $15,500 in alimony, and that Husband willfully used the money in the health savings account for his benefit and failed to make any effort to transfer the $4,500 in proceeds of the account to Wife. In the petition, Wife alleged she had performed all of her obligations under the Agreement, and asked this Court to pay her the money owed from the proceeds of the St. Johns Road property[1], which was under contract for sale, or put the proceeds into escrow until such time as Husband satisfied his financial obligations under the Agreement. By Order of Court dated February 25, 2014, a conference call was scheduled for February 27, 2014. An Order of Court dated February 28, 2014 was entered after the conference call and in consideration of Wife's Petition, directing that $8,000.00 from the proceeds of the sale of the St. Johns Road property be put in escrow with the firm of Entwistle & Roberts pending agreement of the parties or further Order of Court. The February 28, 2014 Order of Court also stated that a hearing on Wife's Petition, if necessary, would be set by separate Order of Court.

---

[1] As described in the parties' Agreement, the parties owned two pieces of marital property, a property at 1220 Pine Grove Road and a property at 105 St. Johns Road West, Littlestown, Pennsylvania. Pursuant to the Agreement, Husband was to continue to occupy the 105 St. Johns Road property, and Wife would execute a quit claim deed to this property. It appears that pursuant to the Agreement, Husband would retain this property and therefore any proceeds from a sale of the property would belong to Husband. From what this Court can glean from the parties' filings, Husband decided to sell this property, and because the property was technically still owned by both parties, both parties entered into a contract for sale of the property.

3

On April 8, 2014, Husband filed a Petition for Hearing, requesting a hearing be scheduled regarding Wife's Petition. By Order of Court dated April 11, 2014, a hearing was scheduled for May 20, 2014.

A hearing on Wife's Petition was held on May 20, 2014. This Court asked both parties for their respective positions. Transcript at 6. Attorney Roberts on behalf of Wife explained Wife's position regarding Husband's obligations. Transcript at 6. Attorney Roberts indicated that there were three issues to be presented at the hearing. First, that Husband was obligated to pay Wife $500 per month in alimony since 2009, that Wife received some of the alimony payments, but that Husband still owed Wife some alimony payments. Transcript at 6 – 7. Second, that Husband and Wife had agreed to pay for some of their son T.J.'s tuition, and that Wife believed her obligation was satisfied. Transcript at 7 – 9. Wife's final issue involved a health savings account of approximately $4,500, which Attorney Roberts indicated Husband was obligated to make available to Wife under the Agreement, but which Wife alleged Husband used for his own benefit. Attorney Roberts presented a fourth issue regarding car insurance, indicating that she believed Husband was seeking a credit for payment of the parties' son's car insurance. Transcript at 9 – 10. This Court asked Attorney Roberts how much Wife believed she was owed, and Attorney Roberts stated that Wife believed she was owed about $16,500 from Husband. Transcript at 10.

Attorney Mooney than spoke on behalf of Husband. Attorney Mooney indicated that the parties' Agreement was contained in the eight page transcript from the Master's Hearing. Transcript at 11. Attorney Mooney indicated that per the first part of the Agreement, Husband was theoretically $12,500 short regarding alimony. Transcript at 11. Attorney Mooney indicated that Husband's estimate of his alimony obligation, $12,500 was close to Wife's estimate of

4

$12,592. Transcript at 11. Attorney Mooney indicated that proof of four alimony checks had been provided to Wife. Transcript at 11. Attorney Mooney then described the second part of the parties' Agreement regarding the son's expenses for college and car insurance. Transcript at 12. Attorney Mooney indicated that Husband believed he overpaid the son's tuition by $5,200. Transcript at 12. Attorney Mooney also indicated that Husband paid 100% of the son's car insurance costs, and Husband believed he was only responsible for 70% of these costs per the Agreement. Transcript at 12. Attorney Mooney indicated that Husband believed he overpaid the car insurance by $1,786. Transcript at 13. Attorney Mooney then described the final issue regarding the health savings account. Transcript at 13. Attorney Mooney indicated that Husband had in fact used the health savings account, but with Wife's knowledge. Transcript at 13. This Court asked Attorney Mooney how much Husband thought he owed Wife, and Attorney Mooney first indicated that Husband owed Wife less than $6,000, but then indicated that with the car insurance and college overpayments, Husband probably did not owe Wife anything. Transcript at 14.

This Court and the attorneys then discussed some of the details of the Agreement regarding the son's college expenses. The attorneys agreed that the parties were to come up with half of the son's tuition between them. Transcript at 16. The attorneys indicated some confusion about the amount of payments for the son's costs of attendance at Shippensburg University and Carroll County Community College. Transcript at 17. The son also attended the Sheffield Institute for the Performing Arts. Transcript at 18. The cost of attendance at Sheffield was discussed between this Court and the attorneys. Transcript at 18 – 21. The cost of the Sheffield education was $28,561. Transcript at 19. The out-of-pocket expense for Sheffield was $15,905. Transcript at 19. Attorney Roberts indicated that the son's 50% responsibility for tuition costs

5

was taken care of by a grant which reduced the educational expenses from $28,561 to $15,905. Transcript at 19. Attorney Roberts indicated that Wife believed Husband should pay 70% of the approximately $15,000 out-of-pocket expense for Sheffield. Transcript at 21. Attorney Mooney indicated Husband's position that he should be responsible for 70% of half of the out-of-pocket expense, pursuant to the Agreement. Transcript at 21.

This Court then asked the attorneys whether there were any possible future college expenses for the son under the Agreement, and both attorneys indicated that the son had finished his educational pursuits. Transcript at 22. This Court asked the attorneys if there were any other outstanding obligations, and the attorneys indicated that all of the issues had been presented. Transcript at 23. Wife's attorney indicated that Wife had made a settlement proposal, and Husband's attorney indicated that no counter-proposal had been made. Transcript at 23. This Court then asked the parties directly if they had tried to resolve the approximately $16,000 gap between their respective positions. Transcript at 24. Wife indicated that she had tried, and Husband also indicated that Wife had tried. Transcript at 24. This Court asked the parties again to reiterate their positions, and Husband confirmed that he believed he owed Wife nothing and Wife confirmed that she believed she was owed approximately $16,000. Transcript at 25 – 26.

Attorney Mooney then suggested that the parties and attorneys discuss the college costs prior to continuing with the proceedings. Transcript at 26. This Court directed the parties and their attorneys to have the discussion, and the discussion occurred off the record. Transcript at 27. After the discussion, the parties presented this Court with several stipulations:

1. The parties agreed that the monies categorized as alimony were $12,592 short to Wife.

6

2.  The parties agreed that they would disregard the Shippensburg University educational costs.

3.  The parties agreed that the complete cost of the Carroll County Community College education was $4,903.07, 50% of which is equal to $2,451.53. The 70% amount of the $2,451.53 is equal to $1,716.07. The parties agreed that Husband actually paid $3,432.14 (or 70% of the total), which is $1,716.07 more than the 70% of 50% amount. Husband characterized the additional $1,716.07 that he paid as an overpayment, which Wife did not agree with. Wife paid $1,470.92 of the Carroll County Community College expense, which is 30% of the total.

4.  The parties agreed that the actual expenses for the Sheffield Institute totaled $14,845. 50% of $14,845 is $7,422.50, of which 70% of $7,422.50 is $5,195.75. The parties agreed that Husband paid $11,000 of the actual expenses. Husband characterized the additional $5,804.25 as an overpayment, which Wife did not agree with. Wife paid $4,453.50 of the actual expenses, which is equal to 30% of the $14,845.

Transcript at 28 – 31.

This Court then swore in the parties, Transcript at 32, and reviewed the hearing procedure with the parties. Transcript at 33 – 34. Wife testified first on direct examination. Transcript at 36. Wife is a resident of the state of Maryland, and is employed full-time as a property manager. Transcript at 36. Wife was married to Husband, and they were divorced on October 2, 2009. Transcript at 36. The divorce decree referenced the Agreement made between the parties, which was included in the Transcript of Proceedings from the Master's Hearing. Transcript at 36 – 37. Wife had reviewed the Agreement with her prior counsel, Attorney Crabbs. Transcript at 37. Wife's understanding of the alimony provision of the Agreement was that Wife was to receive

7

$500 per month beginning on the first of the month, thirty days after the settlement of the Pine Grove Road property, for sixty (60) months. Transcript at 38. Wife received a check in December of 2009, but did not receive all of the subsequent alimony payments. Transcript at 38. Wife is owed $12,592 in alimony. Transcript at 38. Upon the sale of the Pine Grove Road property, Wife had to sign a quit claim deed to the St. Johns Road property. Transcript at 39. Husband was residing in that property. Transcript at 39.

According to Wife, in September of 2009 the health savings account contained $4,500. Transcript at 39. Wife testified that per the Agreement, the money in the health savings account was to be made available to Wife's benefit so that she could use it or cash it out, with Wife being responsible for any taxes incurred to Husband. Transcript at 40. The money in the health savings account was never made available to Wife and was never transferred to Wife. Transcript at 40. From paperwork Wife received, Wife learned that the money had been expended to pay for medical bills for Husband and the parties' son. Transcript at 40. Wife testified that she was never consulted by Husband regarding removing money from the account. Transcript at 40. Wife testified that Husband did not ask Wife's permission to take the money, and Wife did not know why Husband had taken the money until she found out at a prior court proceeding. Transcript at 41. Wife testified that she is owed that money. Transcript at 41.

Wife testified that the parties' son started attending Carroll County Community College in the spring of 2010. Transcript at 41. The total expense stipulated to for Carroll County did not include the book expenses, which Wife was obligated to pay per the Agreement, and which Wife paid. Transcript at 41 – 42. The Carroll County cost did not include a college expense for room and board. Transcript at 42. The son resided with Wife while at Carroll County, and Wife paid for his room and board. Transcript at 42. Wife did not seek contribution from Husband for the room

8

and board expenses. Transcript at 42. Carroll County's tuition was less expensive than Shippensburg University. Transcript at 42.

Wife testified that the son attended the Sheffield Institute for the Performing Arts subsequent to Carroll County. Transcript at 43. The son took two courses at Sheffield, completing certificates in broadcasting and technical work. Transcript at 43. Sheffield did not include room and board expenses, and the son was living with Wife at the time. Transcript at 43.

Regarding car insurance, Wife testified that Husband was to continue to pay 70% of the son's car insurance, and that Wife was not obligated to pay the other 30%. Transcript at 43 – 44. Wife testified that the wording of the Agreement regarding the parties' obligations to pay for the son's car insurance meant that prior to the Master's Hearing, the parties were sharing in the cost of paying for all of the son's car insurance. Transcript at 44 – 45. Wife assumed that per the Agreement, the son was supposed to pay the other 30% of the car insurance. Transcript at 46. Wife testified that at the close of the Master's Hearing proceedings, she did not think she was obligated to pay any car insurance for the parties' son. Transcript at 46 – 47. Wife testified that as far as she knew, Husband paid 100% of the son's car insurance. Transcript at 47. Wife admitted that she wasn't sure about the car insurance, but she knew that she hadn't paid the 30% of the car insurance, and she did not think the son had paid it. Transcript at 48.

This Court asked Wife if she thought Husband might have a claim against the son for the 30% of the car insurance, and Wife indicated in the affirmative. Transcript 48. Wife testified that the son is using his certifications from Sheffield, working in "technical works" at Definitive Technology in Owings Mills, Maryland. Transcript at 48. Wife testified that she never received any communication or bill requesting a contribution from her for the son's car insurance. Transcript at 49. Wife first learned that Husband was seeking a credit for the car insurance after

9

the start of the current proceedings. Transcript at 49. Wife believed the parties' Agreement settled all issues. Transcript at 49.

Wife testified that at the Master's Hearing, the parties went off the record approximately four times. Transcript at 50. Wife testified that changes to the parties' Agreement were discussed off the record, and some changes to the Agreement were then put on the record at the Master's Hearing. Transcript at 51. Wife indicated that one change or addition was that the parties were only going to pay for four years of the son's schooling, and another change or addition was that the alimony had no modifications. Transcript at 51. Wife testified that both parties were asked at the Master's Hearing if they understood the Agreement and were agreeing to the Agreement. Transcript at 51.

Wife testified that she had communications with Husband prior to the current hearing. Transcript at 51. Wife testified regarding Plaintiff's Exhibit C, an e-mail to Attorney Mooney from Husband, copied to Wife, dated February 18, 2014. Transcript at 53. Attorney Roberts asked Wife if the e-mail indicated Husband may owe Wife money, and Attorney Mooney objected to the question. Transcript at 54. This Court sustained Attorney Mooney's objection but indicated that Attorney Mooney was not objecting to the admissibility of the exhibit. Transcript at 54. Attorney Roberts moved for the admission of Plaintiff's Exhibit C and several other exhibits. Transcript at 54 – 55. The attorneys stipulated that Plaintiff's Exhibits A, B, C, D, E, and F were admitted, and these exhibits were admitted into the record. Transcript at 55.

After some discussion with this Court and the attorneys regarding questions about Exhibits D and G, direct examination of Wife continued. Wife testified that she helped the son enroll in Carroll County Community College. Transcript at 57. Wife testified that she paid for the books and for 30% of the entire bill for Carroll County, and that Husband paid 70% of the

10

entire bill. Transcript at 57. The son did not receive any grant or financial aid for Carroll County. Transcript at 58. Wife confirmed that Carroll County's total tuition was $4,903.07, and that Wife paid 30% of that amount and paid for the books. Transcript at 58. When asked why Wife paid for 30% of the total rather than 30% of half of the tuition, Wife testified that she paid 30% of the total because there were no room and board expenses involved, and the tuition was less expensive than at Shippensburg University. Transcript at 58.

Wife testified regarding Exhibit I. Wife indicated that Exhibit I is a registration statement bill, dated February 1, 2010. Transcript at 59. Wife testified that Husband was given the document. Transcript at 59. Wife testified that she communicated with Husband regarding expenses and alimony payments via text message or e-mail. Transcript at 59. Wife received payments from Husband through the mail or through the parties' son as an intermediary. Transcript at 59. Wife sent copies of the Carroll County bill to Husband through the son. Transcript at 60. Wife testified that Husband never communicated with Wife regarding the school bills and never asked questions about the statements that Wife provided to Husband. Transcript at 60. Regarding Plaintiff's Exhibit K, Wife testified that she believed it was sent to Husband. Transcript at 60. Wife also testified that she believed that Exhibit F was submitted to Husband. Transcript at 60. Wife also testified that she believed that Exhibit O was submitted to Husband. Transcript at 61.

Wife testified that she agreed that the out-of-pocket expense for Sheffield Institute was almost $15,000, and that this expense was not the total overall expense. Transcript at 61. Wife testified that Plaintiff's Exhibit P is the enrollment agreement for one of the son's classes at Sheffield. Transcript at 61. Some discussion on the record was then held between this Court and the attorneys regarding expenses.

11

Wife testified regarding Plaintiff's Exhibit R, a letter to Sheffield, and Plaintiff's Exhibit S, Wife's loan agreement. Transcript at 64. Wife testified that she took out a loan to pay for the son's expenses, in the amount of $4,570.12. Transcript at 64. Wife testified regarding Plaintiff's Exhibit T, an invoice showing the son's grant award that he received for one class at Sheffield. Transcript at 64 – 65.

Wife testified that she and Husband had a conversation regarding the Sheffield expenses. Transcript at 66. Wife testified that the son enrolled in Sheffield on February 26, 2011, and that Wife and Husband spoke about the expenses on the phone two days prior to the enrollment. Transcript at 66 – 67. Wife testified that she shared the details of the expense with Husband. Transcript at 67. Wife told Husband that she believed his proportionate share of the tuition would be $11,000. Transcript at 67. Wife testified regarding the circumstances of the Sheffield tuition and her conversation with Husband:

Q.   Did he agree then -- strike that.
Did he make any comment about any additional portion that he may be paying over and above the 70 percent of the 50 percent?

A.   Yes.

Q.   What did he say?

A.   Sheffield is a private institute and they do not provide any financing. So the first class was canceled, and in order for us to get the grant that I fought for, we had to pay in full for him to start within two days as the class had been canceled several times. So I explained to him we had to come up with this money extremely quickly, and his response was well, that's fine, if that's my portion I will have to deal with that later.

Q.   Okay. And did he say whether -- how he was going to deal with that?

A.   With T.J.

Q.   Did he say I'm going to deal with that with T.J. later?

A.   Yes.

12

Q. So then if he was over paying, did you understand he was going to get the overpayment back from whom?

A. T.J.

Q. Were you seeking any reimbursement for your overpayment?

A. No.

Transcript at 68 – 69.

Wife then testified on cross-examination. Wife testified that she and Husband were paying the son's car insurance at the time of the Master's Hearing in September of 2009. Transcript at 69. Wife did not agree that at that time Husband was paying 70% of the car insurance and Wife was paying 30% of the car insurance. Transcript at 69. Wife testified that she did not know who was paying the other 30%. Transcript at 70. Wife could not recall if the son remained on her auto insurance after the Master's Hearing. Transcript at 70. Wife could not recall getting checks on account of the son's car insurance after the Master's Hearing. Transcript at 70. Wife testified that subsequent to the year 2009 the son went onto Husband's car insurance. Transcript at 70. Wife recalled that Husband was paying part of the son's car insurance prior to the Master's Hearing. Transcript at 71. Wife could not recall a check payable to Wife from the son's insurance carrier in the amount of $697.90. Transcript at 71. Wife testified that she did not know whether the son was covered on Wife's insurance policy at that time. Transcript at 71. Wife did recall being at the Master's proceeding. Transcript at 71.

Wife testified that she did not personally or physically hand deliver the college bills to Husband. Transcript at 71 – 72. Wife testified that she did not send the college bills to Husband via e-mail. Transcript at 72. Wife testified that Husband provided Wife with checks to pay for the colleges. Transcript at 72. Wife gave Husband the amount to pay and Husband sent that

13

amount to Wife. Transcript at 72. Wife recounted that her conversation with Husband regarding the Sheffield tuition occurred two days before February 26, 2011, the date of the enrollment agreement. Transcript at 72. Wife testified that the enrollment agreement states the cost of one class. Transcript at 73. Wife testified that the grant was received before signing the enrollment agreement. Transcript at 73. Wife testified that Plaintiff's Exhibit R is her correspondence to Sheffield by which she sent the $11,000 that Husband provided to Wife to Sheffield. Transcript at 73. Wife testified that the enrollment agreement does not mention the other course. Transcript at 73. Wife testified that Plaintiff's Exhibit T is an invoice dated April 29, 2011. Transcript at 73. Wife indicated that the invoice was the first time Wife received the grant information. Transcript at 74. Wife testified that she did not know during the discussion with Husband prior to signing the enrollment agreement that there was a subsequent class that wasn't going to be subject to a full payment. Transcript at 74. Wife confirmed that she indicated to Husband that if the money was not sent to Sheffield, the son would not be attending. Transcript at 74. Wife confirmed that Husband provided the $11,000. Transcript at 74. Wife testified that between the time of separation and the time the son came off of Wife's car insurance, the son never paid Wife for his car insurance. Transcript at 74.

On redirect examination, Wife confirmed that she received the tuition checks from Husband and then made the tuition payments. Transcript at 75. Wife testified that she provided Husband with the statements upon receipt. Transcript at 75. Wife testified that Husband never disputed the amount he was to pay. Transcript at 75. Wife confirmed that after the Master's Hearing Agreement was entered, the son went off of Wife's car insurance and on to Husband's car insurance. Transcript at 75. Wife testified that Husband never sought or suggested that Wife owed him 30% of the car insurance. Transcript at 76. Wife testified that Husband never sought

14

contribution to the car insurance in his e-mails, and never asked Wife for contribution. Transcript at 76.

Husband then testified on direct examination. Husband testified that at the time of the Master's Hearing, he was "pretty much paying all" of the son's car insurance. Transcript at 77. Husband testified he paid 100% of the car insurance. Transcript at 78. Husband testified that he sent Wife checks on account of the car insurance while the son was on Wife's policy. Transcript at 78. Husband testified that Defendant's Exhibit #2 is a copy of all of the checks that Husband sent to Wife for insurance or bills that were paid on account of the son's car insurance. Transcript at 79. The total car insurance bill for the son was $1,786.92. Transcript at 79.

Husband testified that Defendant's Exhibit #4 is regarding an Optimum Health Bank account. Transcript at 82. Husband testified that the exhibit indicated the balance of the account to be $4,133.65 in January of 2010. Transcript at 82. Husband testified that Wife had access to the account. Transcript at 83. Husband testified that he used the account to pay expenditures for the son's medical expenses. Transcript at 83. When asked if Wife was aware of this, Husband testified that he sent Wife an e-mail "telling her that." Transcript at 83. Husband testified that the account was completely used. Transcript at 83. Husband testified that the son's medical expenses paid out of that account were about $3,800. Transcript at 83. Husband testified that the expenses were for wellness, emergency care, dental bills, and the Gettysburg emergency room. Transcript at 83 – 84. Husband could not recall when he first told Wife that he used the account for the son's bills. Transcript at 84. Husband testified that he does not have the e-mail he sent Wife. Transcript at 84.

Regarding Sheffield Institute, Husband testified that during their discussion prior to the son's enrollment, Wife told Husband how much money he would need to get. Transcript at 84.

15

Husband testified that he assumed the amount was 70% of 50% of the tuition. Transcript at 84.

Husband testified that he paid approximately $3,000 for the son's Carroll County tuition.

Transcript at 84. Husband described how he would pay the tuition for Carroll County:

> Well, I was on the job, the property that she was on, and we communicated back and forth. She would tell me what T.J.'s college tuition was. I would then give her a check for that amount, and either that afternoon or the next day she would pay the bill, and then I would get a receipt from that. So I never knew in writing prior to that.

Transcript at 85.

Husband then testified on cross-examination. Husband was asked where in the Agreement it said that Wife was to be responsible for the 30% of the car insurance. Husband testified that Wife was the other party in the Agreement, and that the Agreement referred to two parties. Transcript at 85. When questioned, Husband clarified that the Agreement does not specify Wife by name as being responsible for 30% of the car insurance. Transcript at 86. Husband testified that it was incorrect that he had never previously requested contribution from Wife for the car insurance. Transcript at 86. Husband testified that after the son's car insurance changed over to Husband's policy, Husband had a phone conversation with Wife and told Wife what her percentage of the car insurance was. Transcript at 87. Husband testified that Wife did not pay the car insurance. Transcript at 87. Husband testified that he assumed he would be getting a check, but he never received a check. Transcript at 87. Husband testified that the phone conversation was the only conversation he ever had with Wife regarding the car insurance, and that he never followed up with Wife on the subject. Transcript at 87.

Husband testified regarding the health savings account. Husband confirmed that he testified that he put Wife's name on the account. Transcript at 88. Husband testified that he contacted Optimum Health Bank the Thursday prior to the current hearing, and that the bank was

16

supposed to e-mail Husband with confirmation that Wife's name had been on the account since June of 2006 and that she had been issued a debit card for that account. Transcript at 88. Husband clarified his communication to Wife regarding his use of the account. Husband indicated that he sent Wife an e-mail stating what the money was used for, and that Wife did not question the amount of money that was deducted from the account. Transcript at 89.

Husband clarified that he never said that Wife was okay with his use of the money. Transcript at 89. Husband testified that he did not know whether Wife was in agreement or not with Husband's use of the money. Transcript at 89. Husband testified that he did not know when Wife learned that Husband was using the money for himself and the son. Transcript at 90. Husband testified that in a March 26, 2012 e-mail to Wife, he told Wife he would put the money back in the account. Transcript at 90. Husband testified that he did not know how Wife would know she was on the account. Transcript at 90. Husband testified that his only evidence to show that Wife was on the account was documentation of his phone calls over the prior week with the bank regarding confirmation of Wife being on the account since 2006. Transcript at 90 – 91. Husband testified that it was not correct that the parties had heated conversations regarding Wife not being able to get access to the account. Transcript at 91. Husband testified that a stipulated e-mail for submission at the hearing indicated that Wife continues to raise the health savings account as an issue. Transcript at 91. Husband testified that Wife contacted the bank multiple times, that the bank issued a debit card from the account, and that Wife knew she was on the account. Transcript at 91. Husband admitted that Wife had stated in an e-mail that the bank had sent the information to Husband's house but that Wife wasn't receiving it. Transcript at 91. Husband testified that the information never came to his house. Transcript at 91.

17

Husband testified that at the time, the son had health insurance via Husband's health insurance. Transcript at 91 – 92. Husband testified that the medical expenses paid for from the account were for both Husband and the son, but that "a lot of the money that came out of the savings account was for T.J." Transcript at 92. Husband admitted that the parties' Agreement does not reference an exception for the use of the savings account for the son. Transcript at 92. Husband admitted that the parties' Agreement contains no reference to the son and medical expenses or health insurance. Transcript at 92. Husband admitted using the account for the son's benefit. Transcript at 92.

Regarding Sheffield, Husband testified that he had learned of the actual cost of Sheffield six months prior to the current hearing. Transcript at 93. Husband testified that he had a conversation with the son regarding the son's responsibility for 50% of the cost of Sheffield. Transcript at 93. Husband testified that Plaintiff's Exhibit I is a statement from Carroll County Community College regarding the son's tuition. Transcript at 94. Husband testified that Exhibit I was not the kind of receipt that Wife would send to Husband. Transcript at 94. Husband testified that he only received two or three receipts from Wife, but that they did in fact resemble the exhibit. Transcript at 94.

Husband testified that he received some receipts from Wife for Carroll County. Husband testified that after he received the receipts, Husband never had a conversation with Wife regarding Husband's overpayments. Transcript at 94. Husband disagreed that the reason he did not have the conversations was because Wife was paying for room and board. Transcript at 94.

Regarding alimony, Husband testified that the last time he paid any alimony to Wife was in April of 2013. Transcript at 94 – 95. Husband testified that he was not seriously behind on payments at that time. Transcript at 95. Husband indicated his agreement that he has not paid

18

$12,592 in alimony. Transcript at 95. Husband agreed that he owed thirteen months of alimony since April of 2013, which would be about $6,500. Transcript at 95. Attorney Roberts asked Husband if he would therefore still owe $6,000 from before April 2013, and Attorney Mooney indicated that he stipulated to Attorney Roberts' math skills but failed to see the relevance. Attorney Roberts withdrew the question. Transcript at 95 – 96. Husband testified that he hasn't had the money to make the alimony payments. Transcript at 96. Husband testified that he did not know if he owed alimony or if the alimony was paid up in full in 2012. Transcript at 96. Husband agreed that he was definitely behind in alimony in 2013. Transcript at 96 – 97. When asked about his bank statements, Husband indicated that according to the bank statements it might look like he could afford alimony but that the bank statements did not show all of his bills. Transcript at 97. Husband testified that in an e-mail to Wife, he indicated that he did not think he was as far behind as Wife thought regarding alimony payments. Transcript at 99. Husband testified that his issues presented regarding car insurance and the health savings account were not an attempt to negate his alimony obligation. Transcript at 100.

On redirect examination, Husband testified that he was making between $180,000 to $190,000 per year in 2009, and that his pay decreased thereafter to about $100,000 to $110,000 per year in years 2011, 2011, and 2013. Transcript at 101 – 102.

On recross-examination, Husband confirmed that his salary decreased to about $110,000 per year. Transcript at 102. Husband testified that he did not ask Wife for a break on the alimony. Transcript at 102.

At the conclusion of the hearing, Plaintiff's Exhibits I, J, K, M, N, O, P, R, S, T, U, V, and W, and Defendant's Exhibits #2 and 4 were admitted without objection.

19

After the hearing, by Order of Court dated May 20, 2014, this Court ordered that Wife had until May 30, 2014 to submit a memorandum and Husband had until June 13, 2014 to submit a reply memorandum. At the request of the parties, neither party submitted a memorandum.

On June 13, 2014, Husband filed a Petition for Leave of Court to Supplement Record, asking to supplement the record with Husband's Schedule C federal income tax forms for the years 2010, 2011, and 2012. Husband's Petition indicated that Wife's counsel was unable to consent to the supplementation of the record. Husband's Petition also indicated that Husband believed and averred that the interest of justice were best served by supplementing the record so that this Court could view Husband's net income, rather than the alleged gross income Husband had testified to at the hearing.

By Order of Court dated June 16, 2014, this Court provided each party with a deadline of June 23, 2014 to file and serve on the opposing party any proposed supplement to the record that the party would like for this Court to consider in making its decision. This Court also provided each party with a deadline of June 30, 2014 to file and serve any objection to a proposed supplement. This Court indicated that it would determine whether any or all of the supplements would be admitted into evidence, and would assign the appropriate weight, if any, to any admitted supplements.

On June 19, 2014, Husband filed his Supplement to Record, consisting of his 2010, 2011, and 2012 Schedule C forms. Husband specifically indicated on the Supplement to Record that he offered "this evidence of his income not for purposes of any modification, but rather to assist the court in determining his ability or inability to pay alimony to Plaintiff." On June 27, 2014, Wife filed an Objection to Husband's Supplement.

20

On July 7, 2014, this Court entered its Order of Court regarding Wife's Petition for Special Relief and Civil Contempt for Disobedience of an Order. On August 5, 2014, Husband timely filed his Notice of Appeal of the July 7, 2014 Order of Court and his Request for Transcript. By Order of Court dated August 5, 2014, this Court directed that Husband file of record and serve on the undersigned a concise statement of the matters complained of on appeal. On August 19, 2014, Husband timely filed his Statement of Matters Complained of on Appeal Pursuant to Pa.R.A.P. 1925(a)(2)(i).

## DISCUSSION

Husband has filed three matters complained of in his Statement of Matters Complained of on Appeal Pursuant to Pa.R.A.P. 1925(a)(2)(i):

1. The Trial Court abused its discretion and/or made an error of law when it concluded, against the weight of the evidence, that Plaintiff is not obligated to reimburse Defendant for his $5,804.2[5] overpayment for the parties' son's tuition at Sheffield Institute when Plaintiff failed to advise Defendant of the grant that Plaintiff obtained to lower the total school expenses and presented Defendant with an urgent need for money. The Defendant did not agree to pay more than his obligation.

2. The Trial Court abused its discretion and/or made an error of law when it concluded, against the weight of the evidence, that Defendant owes Plaintiff the amount of $4,500.00 for the withdrawal of said funds from the Health Savings Account when Plaintiff knew that Defendant used the funds for [the] parties' son's medical expenses, which was one of the purposes and intent of the account, especially when Plaintiff never objected to the expenditure for several years.

3. The Trial Court abused its discretion and/or made an error of law when it concluded, against the weight of the evidence, that Defendant's obligation to Plaintiff is $13,589.01 as Defendant's obligation should be $3,284.77.

The standard of review of a trial court's decision regarding a marriage settlement agreement is well settled:

21

"The determination of marital property rights through prenuptial, postnuptial and settlement agreements has long been permitted, and even encouraged." *Sabad v. Fessenden*, 825 A.2d 682, 686 (Pa.Super. 2003) (quoting *Laudig v. Laudig*, 624 A.2d 651, 653 (Pa.Super. 1993)). Both prenuptial and post-nuptial agreements are contracts and are governed by contract law. *Laudig, supra.* Moreover, a court's order upholding the agreement in divorce proceedings is subject to an abuse of discretion or error of law standard of review. *See Busch v. Busch*, 732 A.2d 1274, 1276 (Pa.Super. 1999), *appeal denied*, 760 A.2d 850 (Pa. 2000) (citing *Laudig, supra*). An abuse of discretion is not lightly found, as it requires clear and convincing evidence that the trial court misapplied the law or failed to follow proper legal procedures. *Paulone v. Paulone*, 649 A.2d 691 (Pa.Super. 1994). We will not usurp the trial court's factfinding function. *Laudig, supra.*

*Lugg v. Lugg*, 64 A.3d 1109, 1110 (Pa.Super. 2013) (quoting *Paroly v. Paroly*, 876 A.2d 1061, 1063 (Pa.Super. 2005)).

Parties to a marriage settlement agreement may enforce their agreement under the Divorce Code, as amended. Title 23 section 3105 "Effect of agreement between parties" states, in part:

(a) Enforcement.--A party to an agreement regarding matters within the jurisdiction of the court under this part, whether or not the agreement has been merged or incorporated into the decree, may utilize a remedy or sanction set forth in this part to enforce the agreement to the same extent as though the agreement had been an order of the court except as provided to the contrary in the agreement.

23 Pa.C.S. § 3105. Title 23 section 3502(e) describes the powers of the trial court to enforce an order of equitable distribution or an agreement between the parties:

(e) Powers of the court.-- If, at any time, a party has failed to comply with an order of equitable distribution, as provided for in this chapter or with the terms of an agreement as entered into between the parties, after hearing, the court may, in addition to any other remedy available under this part, in order to effect compliance with its order:
    (1) enter judgment;
    (2) authorize the taking and seizure of the goods and chattels and collection of the rents and profits of the real and personal, tangible and intangible property of the party;
    (3) award interest on unpaid installments;
    (4) order and direct the transfer or sale of any property required in order to comply with the court's order;

22

(5) require security to insure future payments in compliance with the court's order;

(6) issue attachment proceedings, directed to the sheriff or other proper officer of the county, directing that the person named as having failed to comply with the court order be brought before the court, at such time as the court may direct. If the court finds, after hearing, that the person willfully failed to comply with the court order, it may deem the person in civil contempt of court and, in its discretion, make an appropriate order, including, but not limited to, commitment of the person to the county jail for a period not to exceed six months;

(7) award counsel fees and costs;

(8) attach wages; or

(9) find the party in contempt.

23 Pa.C.S. § 3502(e). The trial court also has powers in equity in divorce cases:

> Equity power and jurisdiction of the court.--In all matrimonial causes, the court shall have full equity power and jurisdiction and may issue injunctions or other orders which are necessary to protect the interests of the parties or to effectuate the purposes of this part and may grant such other relief or remedy as equity and justice require against either party or against any third person over whom the court has jurisdiction and who is involved in or concerned with the disposition of the cause.

23 Pa.C.S. § 3323(f). The parties, in forming their Agreement, agreed that this Court "would retain jurisdiction of this matter after entry of the Divorce Decree in the event there was any need for further interactions between the Parties." *See* Agreement at 7. Pursuant to 23 Pa.C.S. § 3105(a), this Court may enforce the parties' Agreement as it would enforce an Order of Court under the Divorce Code. Pursuant to 23 Pa.C.S. § 3502, this Court may enforce the parties' Agreement by entering judgment, awarding interest, awarding counsel fees and costs, and by finding a party in contempt, amongst other powers. Pursuant to 23 Pa.C.S. § 3323(f), this Court may issue an order of court in equity against one party to protect the interests of the other party as equity and justice requires.

A marriage settlement agreement that is incorporated, but not merged, with a divorce · decree "must be viewed as a separate and independent contract that survived the divorce decree."

23

*Wineburgh v. Wineburgh*, 816 A.2d 1105, 1107 – 08 (Pa.Super. 2002) (quoting *Kripp v. Kripp*,

784 A.2d 158, 162 (Pa.Super.2001)).

> In Pennsylvania, we enforce property settlement agreements between husband and wife in accordance with the same rules applying to contract interpretation. *Lyons v. Lyons*, 585 A.2d 42, 45 (Pa.Super. 1991). A court may construe or interpret a consent decree as it would a contract, but it has neither the power nor the authority to modify or vary the decree unless there has been fraud, accident or mistake. *Penn Township v. Watts*, 618 A.2d 1244, 1247 (Pa.Cmwlth. 1992).
>
> It is well-established that the paramount goal of contract interpretation is to ascertain and give effect to the parties' intent. *Lyons v. Lyons, supra.* When the trier of fact has determined the intent of the parties to a contract, an appellate court will defer to that determination if it is supported by the evidence. *Id.*
>
> When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties['] understanding. *Creeks v. Creeks*, 619 A.2d 754, 756 (Pa.Super. 1993). The court must construe the contract only as written and may not modify the plain meaning of the words under the guise of interpretation. *Id.* When the terms of a written contract are clear, this Court will not re-write it or give it a construction in conflict with the accepted and plain meaning of the language used. *Id.*

*Habjan v. Habjan*, 73 A.3d 630, 640 (Pa.Super. 2013) (quoting *Lang v. Meske*, 850 A.2d 737,

739 – 40 (Pa.Super. 2004)).

"A contract is ambiguous if it is reasonably susceptible of different constructions and

capable of being understood in more than one sense." *Osial v. Cook*, 803 A.2d 209, 214

(Pa.Super. 2002) (citing *Walton v. Philadelphia National Bank*, 545 A.2d 1383, 1389

(Pa.Super. 1988)). "The court must determine as a question of law whether the contract terms are

clear or ambiguous." *Id.* "When acting as the trier of fact, the court also resolves relevant

conflicting parol evidence as to what was intended by the ambiguous provisions, examining

surrounding circumstances to ascertain the intent of the parties." *Id.* Parents are not required by

law to provide support for post-secondary education for their children. *See Curtis v. Kline*, 666

24

A.2d 265, 270 (Pa. 1995) (holding that legislature's requirement of divorced parents to provide support for their adult children's post-secondary education is unconstitutional).

Husband's first matter complained of on appeal is as follows:

The Trial Court abused its discretion and/or made an error of law when it concluded, against the weight of the evidence, that Plaintiff is not obligated to reimburse Defendant for his $5,804.2[5] overpayment for the parties' son's tuition at Sheffield Institute when Plaintiff failed to advise Defendant of the grant that Plaintiff obtained to lower the total school expenses and presented Defendant with an urgent need for money. The Defendant did not agree to pay more than his obligation.

Pursuant to the Agreement of the parties, Husband was obligated to pay 70% of 50% of the son's tuition costs, and Wife was obligated to pay 30% of 50% of the son's tuition costs. The other 50% of the son's tuition costs was not the responsibility or obligation of the parties, and therefore fell to the son to make arrangements for this portion of his tuition. Wife was able to obtain a grant to lower the total out-of-pocket expenses for Sheffield Institute to $14,845. As this Court determined in its Order of Court dated July 7, 2014, while the grant lowered the total expenses for the school, it did not replace the son's responsibility toward his college education. Therefore, pursuant to the Agreement, Husband's obligation to pay for the son's tuition at Sheffield Institute was equal to 70% of 50% of $14,845, or .70 x .50 x $14,845 = $5,195.75, and Wife's obligation was equal to 30% of 50% of $14,845 or .30 x .50 x $14,845 = $2,226.75. Husband in fact paid $11,000, an overpayment of $5,804.25, and Wife in fact paid $3,845, an overpayment of $1,618.25.

Husband apparently argues that Wife tricked him into paying more than his share for Sheffield. It appears that Husband's argument is that Husband was unaware of the grant, and that Husband believed that the $11,000 was equal to 70% of 50% of the tuition cost. Husband asserts

25

that Wife should be responsible for Husband's overpayment, and that his alimony obligation should be reduced by the amount of the overpayment.

The record reflects that Husband and Wife spoke about the Sheffield Institute expenses on February 24, 2011, two days prior to the son's enrollment in Sheffield on February 26, 2011. On direct examination at the May 20, 2014 Hearing, Wife testified that she informed Husband that in order to obtain and take advantage of the grant for the school, the bill for the class would have to be paid in full. Wife testified that she told Husband that the money would have to be obtained quickly, and that Husband was aware that he would be paying more than his agreed upon portion per the Agreement. Wife also testified that Husband told Wife he would deal with the overpayment directly through the parties' son. Finally, Wife testified that it was her understanding that Husband would get the overpayment back from the parties' son.

On cross-examination, Wife testified that the grant was received before signing the enrollment agreement. Wife testified that she did not actually receive the grant information until she received the grant invoice. Wife testified that at the time of the February 24, 2011 discussion with Husband, Wife did not know that the subsequent class would not be subject to full payment. Wife also testified that she told Husband that if Sheffield did not receive the tuition money expediently, the parties' son would not be able to attend the school.

Husband testified briefly on direct examination regarding Sheffield Institute, stating that Wife told him how much money he would need to provide, and that he assumed that this amount, the $11,000, was 70% of 50% of the tuition as per the parties' Agreement. On cross-examination, Husband testified that he was aware of the parties' son's responsibility for 50% of the Sheffield Institute tuition, and that he had recently had a conversation with the son regarding that responsibility.

26

Pursuant to the July 7, 2014 Order of Court, this Court determined that Wife did not owe Husband for Husband's overpayment for the Sheffield Institute. Although there appeared to be some confusion in Wife's testimony regarding the timing of the availability of the grant for Sheffield, it is clear from Wife's testimony that Wife informed Husband of what amount of money was needed to have the son enrolled in Sheffield, and that Wife informed Husband that this amount was more than his obligation pursuant to the Agreement. Wife's testimony also indicates that Husband was aware that he would be overpaying and that he could possibly recoup his overpayment from the parties' son, a fact confirmed by Husband's testimony that he spoke to the son prior to the May 20, 2014 hearing about this responsibility.

Both parties paid more than their agreed upon share of the tuition in order to enroll T.J. Baust in the Sheffield school, and for this, T.J. should be very grateful. Time was of the essence to make the required payment such that the parties' son could attend the school, and the parties voluntarily paid more than they were required to pursuant to their Agreement in order to effectuate what was required to accomplish his enrollment. It is not Wife's responsibility to reimburse Husband for his voluntary overpayment. As this Court noted in the July 7, 2014 Order of Court, Husband may be able to obtain reimbursement from the parties' son, who received the benefit of his attendance at Sheffield and is currently using the education he obtained at Sheffield in his own professional working life. This Court did not abuse its discretion or commit an error of law in determining, based on the record, that Husband's overpayment of the Sheffield Institute expense was by the agreement of parties, and that both parties consented to pay the respective amounts required so that T.J. could be enrolled to further his education.

27

Husband's second matter complained of on appeal is as follows:

The Trial Court abused its discretion and/or made an error of law when it concluded, against the weight of the evidence, that Defendant owes Plaintiff the amount of $4,500.00 for the withdrawal of said funds from the Health Savings Account when Plaintiff knew that Defendant used the funds for [the] parties' son's medical expenses, which was one of the purposes and intent of the account, especially when Plaintiff never objected to the expenditure for several years.

Pursuant to the parties' Agreement, the parties agreed that Husband would make the health savings account funds of an approximate balance of $4,500 available to Wife, and all of those funds would be for Wife's benefit. The Agreement clearly and unambiguously states that Wife was to get the health savings account funds as part of the parties' agreed upon equitable distribution. The Agreement is specific, and does not mention that these funds would also be available for Husband's use to pay for Husband's or the son's medical expenses. If, as Husband argues in his second matter complained of, the purpose and intent of the account was to provide for the son's medical expenses, it appears obvious to this Court that such term would have been included in the Agreement. No such term was included in the Agreement.

Husband freely admits that he used the funds and this is not at issue. Husband testified that he used the entire balance of the account for his own benefit and for that of the parties' son. Husband testified that he did not know whether Wife was in agreement or not with his use of the funds. Husband testified that he did not know when Wife learned that he had used the funds. Remarkably, Husband testified that he had told Wife in an e-mail that he would put the money back into the account.

Husband also apparently argues that Wife never objected to Husband's personal use of the account funds for his and the son's benefit, and therefore Wife permitted or allowed Husband to appropriate the funds. The record reflects that Husband testified that he sent Wife an e-mail telling her that he was using the funds. Wife testified that she was never consulted by Husband

28

prior to his use of the funds, and that Husband did not ask Wife's permission to take the money. Husband could not recall when he first told Wife of his use of the funds, and Husband did not retain a copy of the e-mail he allegedly sent to Wife informing her of his use of the funds.

Wife also testified that Husband never made the money in the account available to Wife. Husband testified that Wife had access to the account, and that he had just prior to the May 20, 2014 Hearing asked the bank to give him confirmation that Wife had access to the account. Husband testified that he put Wife's name on the account, however, Husband testified that he did not know how Wife would know she was on the account. Husband testified that he knew the bank could issue a debit card for the account to Wife. Husband also testified that Wife had sent Husband an e-mail in which Wife indicated that the bank had sent Wife's account information to Husband's house but Wife wasn't receiving the information. Husband testified that the information never came to his house.

It appears to this Court that Husband never properly made the funds available to Wife, although it appears that Wife tried to have the funds made available to her by contacting the bank. It is absolutely clear to this Court that Husband used Wife's health savings account funds for his own expenses and for the expenses of the parties' son. Although Husband argues Wife never objected to his use of the funds, the record reflects that Wife did not immediately know of Husband's use of the funds and that Wife did not have proper access to the account to be able to monitor the account funds. The record also reflects that Husband was aware that Wife had continued to raise the health savings account as an issue. This Court faults Husband with not doing more to make the account available to Wife, but even if he had, this does not excuse Husband from his direct and purposeful actions.

29

This Court determined that the proper resolution was for Husband to reimburse Wife for his unauthorized use of Wife's property. The parties' Agreement is clear and the wording of the Agreement was not at issue by the parties, and Husband freely admitted to taking the money. Husband even admitted that he had told Wife he would repay the money. This Court did not abuse its discretion or commit an error of law in ordering Husband to be obligated to Wife for the amount of $4,500, an amount equal to the amount of Wife's health savings account funds which Husband took from Wife without her permission or consent.

Husband's third matter complained of on appeal is as follows:

The Trial Court abused its discretion and/or made an error of law when it concluded, against the weight of the evidence, that Defendant's obligation to Plaintiff is $13,589.01 as Defendant's obligation should be $3,284.77.

Husband does not specify how he arrived at his calculation that his obligation to Wife should be only $3,284.77. It appears that from this Court's calculation of Husband's obligation, $13,589.01, Husband has subtracted the amount he overpaid to Sheffield Institute, $5,804.25, and the amount of the health savings account funds, $4,500. This Court arrives at the amount of $3,284.76 using Husband's suggested arithmetic. This Court has already explained why this Court properly did not reduce Husband's alimony obligation in the amount of his overpayment of $5,804.25, and why this Court properly included the amount of the health savings account funds of $4,500 in his total obligation. This Court did not abuse its discretion or commit an error of law in calculating Husband's obligation to Wife.

It is important to note that in the July 7, 2014 Order of Court, this Court did provide Husband a reduction in his alimony obligation for overpayment of the Carroll County Community College expense, and for overpayment of the son's car insurance expense. Wife

30

found no issue with this Court's determination of the proper credit owed to Husband, and did not appeal this Court's order.

Therefore, for all the reasons stated herein, it is respectfully requested that the Order of Court dated July 7, 2014 be affirmed.

BY THE COURT:

DATE: September 30, 2014

_____
ROBERT G. BIGHAM
Judge

31